**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*Plaintiff*,<br><br>v.<br><br>AMC ENTERTAINMENT HOLDINGS, INC.,<br><br>and<br><br>CARMIKE CINEMAS, INC.,<br><br>*Defendants*. | Civil Action No.: |

<u>**COMPETITIVE IMPACT STATEMENT**</u>

Plaintiff, United States of America, pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C.§16(b)-(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

**I.       NATURE AND PURPOSE OF PROCEEDING**

On March 3, 2016, Defendant AMC Entertainment Holdings, Inc. ("AMC") agreed to acquire all of the outstanding voting securities of Defendant Carmike Cinemas, Inc. ("Carmike"). AMC and Carmike are the second-largest and fourth-largest movie theatre circuits, respectively, in the United States.

AMC owns significant equity in National CineMedia, LLC ("NCM") and Carmike owns significant equity in SV Holdco, LLC, a holding company that owns and operates Screenvision Exhibition, Inc. (collectively "Screenvision").  NCM and Screenvision are the country's two

main, preshow cinema advertising networks, covering over 80% of movie theatre screens in the United States.

The United States filed a civil antitrust complaint on December 20, 2016, seeking to enjoin the proposed acquisition and to obtain equitable relief.  The Complaint alleges that the acquisition, if permitted to proceed, would give AMC direct control of one of its most significant movie theatre competitors, and in some cases, its only competitor, in 15 local markets (identified as the "Local Markets" in the Complaint)[1] in nine states.  Moviegoers would likely experience higher ticket and concession prices and lower quality services in these local markets as a consequence.

The Complaint further alleges that because AMC will hold sizable interests in both NCM and Screenvision post-transaction, and Screenvision will lose Carmike as a source of future growth of its network, the acquisition would substantially lessen competition in the markets for preshow services and cinema advertising.  This loss of competition likely would result in increased prices and reduced services for advertisers and theatre exhibitors seeking preshow services.

The likely effect of AMC's acquisition of Carmike will be to substantially lessen competition in the exhibition of first-run, commercial movies in the 15 Local Markets, and in the sale of preshow services and cinema advertising on a nationwide basis, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

---

[1] As alleged in the Complaint, the 15 Local Markets are Montgomery, Alabama; Destin and Miramar Beach, Florida; Orange Park and Fleming Island, Florida; Cumming, Georgia; Lithonia and Conyers, Georgia; Crestwood and Lansing, Illinois; Normal and Bloomington, Illinois; Pekin, Peoria, and Washington, Illinois; Inver Grove Heights and Oakdale, Minnesota; Coon Rapids and Mounds View, Minnesota; Rockaway and Sparta, New Jersey; Westfield and Cranford, New Jersey; Lawton, Oklahoma; Allentown and Center Valley, Pennsylvania; and Madison and Fitchburg, Wisconsin.

At the same time the Complaint was filed, the United States also filed a Hold Separate Stipulation and Order ("Hold Separate") and a proposed Final Judgment.  Under the terms of the proposed Final Judgment, which is explained more fully below, AMC is required to take certain actions that are designed to eliminate the anticompetitive effects that are likely to result from AMC's acquisition of Carmike.  Specifically, the Defendants are required to:  (1) divest movie theatres in the 15 Local Markets where it and Carmike are direct competitors; (2) sell down its equity interest in NCM such that it owns no more than 4.99%; (3) relinquish its seats on NCM's Board of Directors and all other governance rights it holds in NCM, (4) transfer 24 theaters with a total of 384 screens to the Screenvision cinema advertising network and divest any of those theatres it does not successfully transfer; and (5) implement and maintain "firewalls" to further ensure that it does not obtain NCM's, Screenvision's, or other exhibitors' competitively sensitive information or become a conduit for the flow of such information between NCM and Screenvision.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA.  Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II.     DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A.  Defendants and the Proposed Transaction

Defendant AMC is a Delaware corporation with its headquarters in Leawood, Kansas. As of September 30, 2016, AMC operated approximately 388 theatres with a total of 5,295 screens located across 31 states and the District of Columbia.  AMC reported approximately $1.89 billion in U.S. box office revenues in 2015 and approximately $1.46 billion in U.S. box

office revenues for the first nine months of 2016.  Measured by number of theatres, screens, and box office revenue, AMC is the second-largest theatre circuit in the United States.

AMC is one of the three founders of the NCM cinema advertising network, owns 17.4% of NCM, controls two seats on NCM's Board of Directors, and has certain governance rights over NCM.  AMC's ownership interest in NCM will increase to 26.5% after it acquires Carmike.

Defendant Carmike is a Delaware corporation with its headquarters in Columbus, Georgia.  As of September 30, 2016, Carmike operated approximately 271 movie theatres with a total of 2,917 screens located across 41 states.  Carmike reported approximately $490.0 million in U.S. box office revenues in 2015, and approximately $370.8 million in U.S. box office revenue for the first nine months of 2016.  Measured by number of theatres, screens, and box office revenue, Carmike is the fourth-largest theatre circuit in the United States.

Carmike is the largest theatre circuit in the Screenvision cinema advertising network.  It also owns approximately 19% of Screenvision, controls a seat on Screenvision's Board of Directors, and has certain governance rights over Screenvision.

**B.  The Competitive Effects of the Transaction on the Exhibition of First-Run, Commercial Movies**

**1.  The Relevant Markets**

As alleged in the Complaint, movies are a unique form of entertainment.  The experience of viewing a movie in a theatre is an inherently different experience from live entertainment (*e.g.*, a stage production or attending a sporting event) or viewing a movie in the home (*e.g.*, through streaming video, on a DVD, or via pay-per-view).

Reflecting the significant differences of viewing a movie in a theatre, ticket prices for movies generally differ from prices for other forms of entertainment.  For example, typically, tickets for live entertainment are significantly more expensive than a movie ticket, whereas the

costs of home viewing through streaming video, a DVD rental, or pay-per-view is usually significantly less expensive than viewing a movie in a theatre.

Viewing a movie at home differs from viewing a movie in a theatre in many ways. For example, the size of the screens and sophistication of the sound systems differ, and, unlike at home, in the theatre, one has the social experience of viewing a movie with other patrons.

In addition, the most popular newly released or "first-run" movies are not available for home viewing at the time they are released in theatres. Movies are considered to be in their "first-run" during the four to five weeks following initial release in a given locality. If successful, a movie may be exhibited at other theatres after the first-run as part of a second or subsequent run (often called a "sub-run" or "second-run").

Moviegoers generally do not regard sub-run movies as an adequate substitute for first-run movies. Reflecting the significant difference between viewing a newly released, first-run movie and an older sub-run movie, tickets at theatres exhibiting first-run movies usually cost significantly more than tickets at sub-run theatres.

Art movies and foreign-language movies are also not reasonable substitutes for commercial, first-run movies. Art movies, which include documentaries, are sometimes referred to as independent films. Although art and foreign-language movies appeal to some viewers of commercial movies, art and foreign-language movies tend to have more narrow appeal and typically attract an older audience than commercial movies. Exhibitors consider the operation of theatres that predominantly exhibit art and foreign-language movies to be distinct from the operation of theatres that predominantly exhibit commercial movies.

For all of these reasons, the Complaint alleges that a hypothetical monopolist controlling the exhibition of all first-run, commercial movies in a relevant geographic market would

profitably impose at least a small but significant and non-transitory increase ("SSNIP") in ticket prices.  Thus, the exhibition of first-run, commercial movies is a relevant product market and line of commerce under Section 7 of the Clayton Act in which to assess the competitive effects of this acquisition.

Moviegoers typically are not willing to travel very far from their home to attend a movie. As a result, geographic markets for the exhibition of first-run, commercial movies are relatively local.  As detailed in the Complaint, there are 15 Local Markets in which AMC and Carmike compete today and each is a relevant geographic market in a section of the country for purposes of Section 7 of the Clayton Act.

### 2.  Competitive Effects

Exhibitors compete to attract moviegoers to their theatres over the theatres of their rivals. They do that by competing on price, knowing that if they charge too much (or do not offer sufficient discounted tickets for matinees, seniors, students, or children) moviegoers will begin to frequent their rivals.  Exhibitors also compete by seeking to license the first-run movies that are likely to attract the largest numbers of moviegoers.  In addition, exhibitors compete over the quality of the viewing experience by offering moviegoers the most sophisticated sound systems, largest screens, best picture clarity, best seating (including stadium, reserved, and recliner seating), and the broadest variety and highest quality of snacks, food, and drinks at concession stands or cafés in the lobby or served to moviegoers at their seats.

AMC and Carmike currently compete for moviegoers in the Local Markets.  As detailed in the Complaint, all 15 Local Markets are highly concentrated, and will experience significant additional increases in concentration as a result of the transaction.  In each of the Local Markets, the proposed acquisition would give AMC control of a majority, or all, of the first-run,

commercial movie theatres and between 48% and 100% of the annual box office revenues.   The

transaction will also eliminate substantial head-to-head competition between AMC and Carmike

that has provided consumers with lower prices and a higher quality movie-going experience.

### 3.     Entry and Expansion

Sufficient, timely entry that would deter or counteract the anticompetitive effects in the

Local Markets is unlikely.  Exhibitors are reluctant to locate new, first-run, commercial theatres

near existing, first-run, commercial theatres unless the population density, demographics, or

quality of existing theatres makes new entry viable.  Timely entry of new, first-run, commercial

movie theatres in the areas in and around the Local Markets would be unlikely to defeat a price

increase by the merged firm.

### C.  <u>The Competitive Effects of the Transaction on the Preshow Services and Cinema Advertising Markets</u>

#### 1.  Relevant Markets

As alleged in the Complaint, both preshow services sold to exhibitors and cinema

advertising sold to advertisers in the United States are relevant markets under Section 7 of the

Clayton Act, 15 U.S.C. § 18.

Preshow services consist of the packaging of advertisements and content into a preshow

delivered to exhibitors, enabling them to earn revenue from the use of their screens before the

feature film.  The price charged to exhibitors for preshow services is the portion of advertising

revenue retained by the network.

The sale of preshow services to exhibitors constitutes a relevant product market and line

of commerce under Section 7 of the Clayton Act.  There are no reasonable substitutes for

preshow services.  Exhibitors cannot easily replace the preshow services that they buy from

cinema advertising networks because individual exhibitors generally lack sufficient screens and

geographic reach to secure national advertising.  Nor can exhibitors sufficiently replace national advertising in preshows with local and regional advertising because local and regional advertising generates far less revenue than national advertising.  Because there are no reasonable substitutes for preshow services, a hypothetical monopolist of all such services could profitably impose a SSNIP.  Thus, the Complaint alleges that the market for preshow services is a relevant product market in which to assess the competitive effects of the acquisition.

Cinema advertising is the on-screen advertising incorporated in the preshow.  The Complaint alleges that the sale of cinema advertising to advertisers is a relevant product market and line of commerce under Section 7 of the Clayton Act.  Cinema advertising has important attributes that differentiate it from other forms of video advertising.  For example, the preshow is projected on a large screen with high-quality video and sound in a darkened auditorium.  In contrast to TV and other video advertising platforms, the audience cannot avoid the advertisements by fast forwarding through them, clicking past them, or changing a channel.  The preshow also allows for long-form advertisements typically not available on TV, and it reaches a weekend audience and light TV viewers who are otherwise difficult to reach.

NCM and Screenvision compete with each other throughout the United States.  Exhibitors and advertisers in the United States would not switch to cinema advertising networks located outside of the United States in the event of a SSNIP in the United States.  Accordingly, the Complaint alleges that United States is a relevant geographic market and section of the country for preshow services sold to exhibitors and for cinema advertising sold to advertisers within the meaning of Section 7 of the Clayton Act.

### 2.  Competitive Effects

As a significant owner of equity interests in both NCM and Screenvision post-merger, AMC would have an incentive to reduce the head-to-head competition between NCM and Screenvision.  AMC will likely use its influence and governance rights in both companies to ensure that NCM and Screenvision compete less aggressively to sign contracts with exhibitors and advertisers at the expense of the other network.  AMC will also have the ability to use its access to confidential, nonpublic, and trade secret information of NCM and Screenvision to reduce competition by passing that competitively sensitive information between the companies.

The lessening of competition between NCM and Screenvision will likely result in lower payments and/or lower quality preshows for exhibitors.  Additionally, advertisers will no longer benefit from the lower prices that have resulted from the competition between NCM and Screenvision.  Advertisers do not have choices other than these two networks to reach a broad number of viewers of their cinema advertising.

As further alleged in the Complaint, the loss of an independent Carmike also likely would weaken Screenvision's ability to remain a robust competitive check on NCM, the only other significant competitor in the preshow services and cinema advertising markets.  In 2014, the United States filed a civil antitrust lawsuit to block NCM's acquisition of Screenvision and preserve the intense competition between the companies.  NCM and Screenvision subsequently abandoned their merger in early 2015.  As was the case in 2014, Carmike remains Screenvision's largest exhibitor, and Screenvision touts the Carmike theatre network's current, broad scale when competing to execute deals with advertisers and exhibitors.  The merger, however, will extend AMC's exclusive contract with NCM to include any new theatres that Carmike would have opened or acquired.  This shift from Screenvision to NCM will likely weaken Screenvision's

ability to compete because: 1) it will be unable to rely on Carmike's growth to increase its

network's scale; and 2) the number of independent theatre exhibitors unencumbered by an

exclusive preshow agreement with NCM will shrink as exhibitor consolidation continues.  For all

of these reasons, the Complaint alleges that the merger is likely to substantially lessen

competition in the preshow services and cinema advertising markets.

### 3.  Entry and Expansion

According to the Complaint, the entry barriers associated with developing a cinema

advertising network are high, and thus new entry or expansion by existing competitors is

unlikely to prevent or remedy the proposed merger's likely anticompetitive effects in the

preshow services and cinema advertising markets.  Barriers to entry and expansion include the

time and cost of developing a network of screens to achieve sufficient scale.  NCM's and

Screenvision's lock-up of almost all of the exhibitors in the United States through staggered

long-term contracts makes entry a long process.  This adds to the already high cost of building

the infrastructure necessary to develop and attract national advertisers.  It also increases the

length of time an entrant must sustain losses before its scale is large enough to sell advertising at

long-term profitable rates.

Exhibitors generally cannot supply preshow services themselves to replace the substantial

lessening of competition in the preshow services market.  Individual exhibitors or groups of

small exhibitors whose contracts with NCM or Screenvision are expiring are unlikely to be able

to establish cost-effective sales forces, attract national advertisers, or otherwise develop a

sufficient infrastructure to reasonably replace lost competition.

### III.    EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The movie theatre divestiture requirement of the proposed Final Judgment will eliminate the anticompetitive effects of AMC's acquisition of Carmike in each of the 15 Local Markets for the exhibition of first-run, commercial movies by establishing new, independent, and economically-viable competitors.  The other requirements of the proposed Final Judgment will eliminate the anticompetitive effects of the acquisition on the preshow services and cinema advertising markets by requiring AMC to divest most of its ownership interest in NCM, relinquish its NCM Board seats and all governance rights, transfer 24 AMC theatres with a total of 384 screens to the Screenvision network, and implement firewalls to prevent the misuse of competitively sensitive information.

### A.  <u>Theatre Exhibition of First-Run, Commercial Movies</u>

Section IV.A of the proposed Final Judgment requires Defendants within sixty calendar days after the filing of the Complaint, or five calendar days after the Court's entry of Final Judgment, whichever is later, to divest as viable, ongoing businesses the theatres identified on the "Initial Theatre Divestiture Assets" list in Appendix A to the proposed Final Judgment to one or more acquirers acceptable to the United States in its sole discretion.  This will require Defendants to divest a minimum of 15 theatres covering each of the Local Markets.

The theatres must be divested in such a way as to satisfy the United States that they can and will be operated by the purchaser as viable, ongoing businesses that can compete effectively as first-run, commercial theatres.  To that end, the proposed Final Judgment provides the acquirer(s) of the theatres with an option to enter into a transitional agreement with Defendants of up to 120 days in length, with the possibility of one or more extensions not to exceed six months in total, for the supply of any goods, services, support, including software service and

support, and reasonable use of the name AMC, the name Carmike, and any registered service marks of AMC or Carmike, for use in operating those theatres during the period of transition. The availability of a transitional agreement will ensure that the acquirer(s) of the theatres can operate without interruption while long-term supply agreements are arranged and the theatres rebranded.

In the event that Defendants do not accomplish the theatre divestitures within the periods prescribed in the proposed Final Judgment, Section VI of the proposed Final Judgment provides that the Court will appoint a Divestiture Trustee selected by the United States to effectuate the theatre divestitures required by the Final Judgment.

If Defendants are unable to effectuate any of the divestitures due to their inability to obtain the consent of the landlord from whom a theatre is leased, Section IV.K of the proposed Final Judgment requires them to divest alternative theatre assets that compete effectively with the theatres for which the landlord consent was not obtained.  This provision will ensure that any failure by Defendants to obtain landlord consent does not thwart the relief obtained in the proposed Final Judgment.

The theatre divestiture provisions of the proposed Final Judgment will eliminate the anticompetitive effects of AMC's acquisition of Carmike in the exhibition of first-run, commercial movies in the Local Markets.

In addition to the proposed Final Judgment's provisions, the Hold Separate provides that, until the divestitures take place, AMC and Carmike must maintain the sales and marketing of the theatres, and maintain the theatres in operable condition at current capacity configurations.  In addition, AMC and Carmike must not transfer or reassign to other areas within the company their

employees with primary responsibility for the operation of the theatres, except for transfer bids initiated by employees pursuant to Defendants' regular, established job-posting policies.

## B. Preshow Services and Cinema Advertising

The proposed Final Judgment will remedy the anticompetitive effects of the proposed transaction in the markets for preshow services and cinema advertising in two principal ways.

*First,* the proposed Final Judgment will significantly reduce AMC's incentive and ability to weaken head-to-head competition between NCM and Screenvision following the merger. In the absence of relief, AMC's significant equity holdings in both NCM and Screenvision would give AMC the incentive post-merger to use its governance rights to soften each company's competitive actions towards the other and use its access to each company's competitively sensitive information to help the companies coordinate their actions. The proposed Final Judgment significantly reduces AMC's incentives to lessen competition or favor NCM over Screenvision by requiring AMC to sell down its NCM equity holdings to a level of no more than 4.99%. Pursuant to NCM's governing documents, AMC would lose its right to seats on NCM's board of directors. Because the divestiture will leave AMC with a relatively small stake in NCM – both in terms of its proportion of the whole and total value – it would no longer earn significant profits from a lessening of competition between NCM and Screenvision. Moreover, the NCM profits to be earned from any action AMC were to take to lessen such competition would largely accrue to its theatre exhibitor rivals Regal and Cinemark, an unappealing outcome to AMC.

To further reduce AMC's ability to lessen head-to-head competition between NCM and Screenvision, Section X.A of the proposed Final Judgment prohibits AMC from holding NCM board seats or otherwise exercising any governance rights in NCM. In addition, Section X.B of the proposed Final Judgment prohibits AMC from, among other activities, attending NCM board

meetings, receiving nonpublic information from NCM, or proposing NCM make future acquisitions.  These provisions, along with the loss of AMC's rights to participate in NCM's business as a result of the sell down of AMC's equity interest below 5%, will render AMC unable to direct or influence NCM to soften its competitive actions towards Screenvision.

In order to further ensure that AMC cannot use its position as an owner and major customer of NCM and Screenvision to obtain competitively sensitive information that could be used to facilitate improper coordination or otherwise cause competitive harm, Section XII of the proposed Final Judgment requires AMC to institute firewalls to prevent AMC from obtaining competitively sensitive information from either NCM or Screenvision, passing competitively sensitive information between NCM and Screenvision, or obtaining from NCM or Screenvision competitively sensitive information about any of NCM or Screenvision's other exhibitor customers.

*Second*, the proposed Final Judgment seeks to ensure that Screenvision will remain a strong competitor to NCM in the preshow services and cinema advertising markets.  As alleged in the Complaint, Screenvision is NCM's only significant competitor in these markets, and Carmike is Screenvision's largest theatre exhibitor.  While Carmike's legacy theatres will remain in Screenvision's network for the remainder of the Carmike/Screenvision contract, the merger will deprive Screenvision of Carmike's expected growth through future acquisitions and new theatre builds.  To offset this loss of future Carmike growth, Section XI.A of the proposed Final Judgment requires the Defendants to transfer the 24 theatres identified in Appendix B to the proposed Final Judgment, comprising a total of 384 screens, to Screenvision for the term of the Final Judgment and to stop utilizing NCM preshow and theatre advertising services at these theatres.  If the Defendants fail to effectuate the Screenvision transfer at any of the 24 theatres

within the time period set forth in Section XI.A, Section XI.B requires AMC to divest such theatres pursuant to the procedures set forth in Section IV.B of the proposed Final Judgment.  In addition to the screen transfer, Screenvision will also benefit from AMC's plans to remodel a significant number of Carmike theatres, which will likely increase audience attendance at those theatres.  Taken together, Screenvision will obtain through the screen transfers and theatre remodeling the credibility and additional scale—both in terms of geographic coverage and increased audiences—to compete effectively for advertisers and exhibitors against NCM.

In addition, the proposed Final Judgment requires AMC to designate a Compliance Officer who will supervise the AMC's compliance with the Final Judgment, distributing the Final Judgment to the company's personnel, and reporting decree violations, including violations of the firewall provisions, to the United States.

## IV.    REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees.  Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action.  Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against Defendants.

## V.    PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the

United States has not withdrawn its consent.  The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment.  Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the *Federal Register*, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later.  All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court.  In addition, comments will be posted on the U.S. Department of Justice, Antitrust Division's internet website and, under certain circumstances, published in the *Federal Register*.

Written comments should be submitted to:

> Owen M. Kendler
> Acting Chief, Litigation III
> Antitrust Division
> United States Department of Justice
> 450 5th Street, N.W. Suite 4000
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI.    ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against Defendants.  Plaintiff could have continued the litigation and sought

preliminary and permanent injunctions against AMC's acquisition of Carmike.  Plaintiff is

satisfied, however, that the divestiture of assets and other relief described in the proposed Final

Judgment will preserve competition for the exhibition of first-run, commercial movies in the

Local Markets, as well as preserve competition in preshow services and cinema advertising.

Thus, the proposed Final Judgment would achieve all or substantially all of the relief that the

United States would have obtained through litigation, but avoids the time, expense, and

uncertainty of a full trial on the merits of the Complaint.

## VII.    STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

The APPA requires that proposed consent judgments in antitrust cases brought by the

United States be subject to a sixty-day comment period, after which the court shall determine

whether entry of the proposed Final Judgment is "in the public interest."  15 U.S.C. § 16(e)(1).

In making that determination, the court, in accordance with the statute as amended in 2004, is

required to consider:

> (A)     the competitive impact of such judgment, including
> termination of alleged violations, provisions for enforcement and
> modification, duration of relief sought, anticipated effects of alternative
> remedies actually considered, whether its terms are ambiguous, and any
> other competitive considerations bearing upon the adequacy of such
> judgment that the court deems necessary to a determination of whether the
> consent judgment is in the public interest; and

> (B)     the impact of entry of such judgment upon competition in
> the relevant market or markets, upon the public generally and individuals
> alleging specific injury from the violations set forth in the complaint
> including consideration of the public benefit, if any, to be derived from a
> determination of the issues at trial.

*Id*. at § 16(e)(1)(A) & (B).  In considering these statutory factors, the court's inquiry is

necessarily a limited one as the government is entitled to "broad discretion to settle with the

defendant within the reaches of the public interest."  *United States v. Microsoft Corp.*, 56 F.3d

1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp.

2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act); *United States v.*

*US Airways Group, Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (noting that the court's "inquiry is

limited" because the government has "broad discretion" to determine the adequacy of the relief

secured through a settlement); *United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009-2 Trade

Cas. (CCH) ¶ 76,736, 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that

the court's review of a consent judgment is limited and only inquires "into whether the

government's determination that the proposed remedies will cure the antitrust violations alleged

in the complaint was reasonable, and whether the mechanism to enforce the final judgment are

clear and manageable.").[2]

   As the United States Court of Appeals for the District of Columbia Circuit has held, a

court conducting inquiry under the APPA may consider, among other things, the relationship

between the remedy secured and the specific allegations set forth in the government's complaint,

whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and

whether the decree may positively harm third parties.  *See Microsoft*, 56 F.3d at 1458-62.  With

respect to the adequacy of the relief secured by the decree, a court may not "engage in an

unrestricted evaluation of what relief would best serve the public."  *United States v. BNS, Inc.*,

858 F.2d 456, 462 (9th Cir. 1988) (quoting *United States v. Bechtel Corp.*, 648 F.2d 660, 666

(9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F.

Supp. 2d 37, 40 (D.D.C. 2001); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3.  Courts have held

that:

---

[2]  The 2004 amendments substituted "shall" for "may" in directing relevant factors for court to consider
and amended the list of factors to focus on competitive considerations and to address potentially
ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see
also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal
changes" to Tunney Act review).

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree.  The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest*."  More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[3]  In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations."  *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also US Airways*, 8 F. Supp. 3d at 75  (noting that a court should not reject the proposed remedies because it believes others are preferable); *Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter.  "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'"  *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland*

---

[3]  *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass").  *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

*v. United States*, 460 U.S. 1001 (1983); *see also US Airways*, 38 F. Supp. 3d at 76 (noting that room must be made for the government to grant concessions in the negotiation process for settlements (citing *Microsoft*, 56 F.3d at 1461)); *United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy).  To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms."  *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case."  *Microsoft*, 56 F.3d at 1459; *see also US Airways*, 38 F. Supp 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable);  *InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 (concluding that "the 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged").  Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue.  *Microsoft*, 56 F.3d at 1459-60.  As this Court confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power."  489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); *see also US Airways*, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language codified what Congress intended when it enacted the Tunney Act in 1974, as the author of this legislation, Senator Tunney explained: "The court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.[4] A court can make its public interest determination based on the competitive impact statement and response to public comments alone. *US Airways*, 38 F. Supp. 3d at 76.

## VIII.   DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

---

[4]  *See also United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); *United States v. Mid-Am. Dairymen, Inc.*,  No. 73-CV-681-W-1, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980, *22 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

Dated:  December 20, 2016              Respectfully submitted,


                                       _____/s/_____
                                       GREGG I. MALAWER (D.C. Bar #481685)
                                       U.S. Department of Justice
                                       Antitrust Division
                                       450 5th Street, NW, Suite 4000
                                       Washington, DC 20530
                                       Phone:  Gregg Malawer (202) 616-5943
                                       Phone:  Miriam Vishio (202) 598-8091
                                       Fax: (202) 514-7308
                                       E-mail:  gregg.malawer@usdoj.gov

                                       Attorney for the United States