## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*Plaintiff*,<br><br>v.<br><br>AMC ENTERTAINMENT HOLDINGS, INC.,<br><br>and<br><br>CARMIKE CINEMAS, INC.,<br><br>*Defendants*. | Civil Action No.: 16-2475 (RDM) |

## FINAL JUDGMENT

WHEREAS, Plaintiff United States of America filed its Complaint on December 20, 2016 the United States and Defendants, AMC Entertainment Holdings, Inc. ("AMC") and Carmike Cinemas, Inc. ("Carmike"), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, Defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by the Defendants to assure that competition is not substantially lessened;

AND WHEREAS, Plaintiff requires Defendants to make certain divestitures, undertake certain actions, and refrain from certain conduct for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, Defendants have represented to Plaintiff that the divestitures required below can and will be made and the actions and conduct restrictions can and will be undertaken, and that Defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture and other remedy provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I.  <u>JURISDICTION</u>

This Court has jurisdiction over the subject matter of and each of the parties to this action.  The Complaint states a claim upon which relief may be granted against Defendants under Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

## II.  <u>DEFINITIONS</u>

As used in this Final Judgment:

A.    "Acquirer" or "Acquirers" means the entity or entities to which Defendants divest the Theatre Divestiture Assets.

B.    "AMC" means AMC Entertainment Holdings, Inc., a Delaware corporation with its headquarters in Leawood, Kansas, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

C. "Carmike" means Carmike Cinemas, Inc., a Delaware corporation with its headquarters in Columbus, Georgia, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

D. "NCM Divestiture Assets" means that portion of Defendants' NCM Holdings required to be divested under this Final Judgment.

E. "Initial Theatre Divestiture Assets" means the theatre assets listed in Appendix A. The term "Initial Theatre Divestiture Assets" includes:

1. All tangible assets that comprise the business of operating theatres that exhibit movies, including, but not limited to, real property and improvements, research and development activities, all equipment, fixed assets, and fixtures, personal property, inventory, office furniture, materials, supplies, and other tangible property and all assets used in connection with the Initial Theatre Divestiture Assets; all licenses, permits, and authorizations issued by any governmental organization relating to the Initial Theatre Divestiture Assets; all contracts (including management contracts), teaming arrangements, agreements, leases, commitments, certifications, and understandings relating to the Initial Theatre Divestiture Assets, including supply agreements (provided however, that supply agreements that apply to all of each Defendant's theatres may be excluded from the Initial Theatre Divestiture Assets, subject to the transitional agreement provisions specified in Section IV(F)); all customer lists (including rewards and loyalty club data at the option of the Acquirer(s), copies of which may be retained by Defendants at their option), contracts, accounts, and credit records relating to the Initial Theatre Divestiture Assets; all repair and performance records and all other records relating to the Initial Theatre Divestiture Assets; and

3

2.      All intangible assets relating to the operation of the Initial Theatre Divestiture Assets, including, but not limited, to all patents, licenses and sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names, (provided, however, that the names Carmike, AMC, and any registered service marks of Carmike or AMC may be excluded from the Initial Theatre Divestiture Assets, subject to the transitional agreement provisions specified in Section IV(F)), technical information, computer software and related documentation (provided, however, that Defendants' proprietary software may be excluded from the Initial Theatre Divestiture Assets, subject to the transitional agreement provisions specified in Section IV(F)), know-how and trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, all research data concerning historic and current research and development, quality assurance and control procedures, design tools and simulation capability, all manuals and technical information Carmike or AMC provide to their own employees, customers, suppliers, agents, or licensees (except for the employee manuals that Carmike or AMC provide to all its employees), and all research data concerning historic and current research and development.

F.      "Screen Transfer Theatres" means the theatres listed in Appendix B.

G.      "Screen Transfer Divestiture Assets" means any Screen Transfer Theatres that Defendants must divest pursuant to Section XI(B) of this Final Judgment due to Defendants' failure to fully effect the screen transfers required by Section XI(A). The term "Screen Transfer Divestiture Assets" also includes for any such Screen Transfer Theatre:

1.      All tangible assets that comprise the business of operating theatres that exhibit movies, including, but not limited to, real property and improvements, research and

4

development activities, all equipment, fixed assets, and fixtures, personal property, inventory, office furniture, materials, supplies, and other tangible property and all assets used in connection with the Screen Transfer Divestiture Assets; all licenses, permits, and authorizations issued by any governmental organization relating to the Screen Transfer Divestiture Assets; all contracts (including management contracts), teaming arrangements, agreements, leases, commitments, certifications, and understandings relating to the Screen Transfer Divestiture Assets, including supply agreements (provided, however, that supply agreements that apply to all of each Defendant's theatres may be excluded from the Screen Transfer Divestiture Assets, subject to the transitional agreement provisions specified in Section IV(F)); all customer lists (including rewards and loyalty club data at the option of the Acquirer(s), copies of which may be retained by Defendants at their option), contracts, accounts, and credit records relating to the Screen Transfer Divestiture Assets; all repair and performance records and all other records relating to the Screen Transfer Divestiture Assets; and

   2. All intangible assets relating to the operation of the Screen Transfer Divestiture Assets, including, but not limited to, all patents, licenses and sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names, (provided, however, that the names Carmike and AMC, and any registered service marks of Carmike and AMC may be excluded from the Screen Transfer Divestiture Assets, subject to the transitional agreement provisions specified in Section IV(F)), technical information, computer software and related documentation (provided, however, that Defendants' proprietary software may be excluded from the Screen Transfer Divestiture Assets, subject to the transitional agreement provisions specified in Section IV(F)), know-how and trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety

procedures for the handling of materials and substances, all research data concerning historic and current research and development, quality assurance and control procedures, design tools and simulation capability, all manuals and technical information Carmike or AMC provide to their own employees, customers, suppliers, agents, or licensees (except for the employee manuals that Carmike or AMC provide to all its employees), and all research data concerning historic and current research and development.

H.     "Theatre Divestiture Assets" means the Initial Theatre Divestiture Assets and the Screen Transfer Divestiture Assets.

I.     "Landlord Consent" means any contractual approval or consent that the landlord or owner of one or more of the Theatre Divestiture Assets, or of the property on which one or more of the Theatre Divestiture Assets is situated, must grant prior to the transfer of one of the Theatre Divestiture Assets to an Acquirer.

J.     "NCM" means National CineMedia, LLC, a Delaware limited liability company together with National CineMedia, Inc., headquartered in Centennial, Colorado, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

K.     "NCM Holdings" means any equity interest of NCM that AMC owns or controls, directly or indirectly, of NCM, whether voting or nonvoting.

L.     "Competitively Sensitive Information" means all non-public information, provided, disclosed, or otherwise made available to the Defendants by NCM or Screenvision, including but not limited to, information related to: (i) current or future business plans; (ii) technological tests or initiatives; (iii) investments, finances or budgets; (iv) pricing; (v) information related to other movie theatre exhibitors; (vi) terms and conditions (including but not

6

limited to fees or prices) of any actual or prospective contract, agreement, understanding, or relationship concerning the exhibition of first-run commercial movies or preshow and cinema advertising services, to specific or identifiable customers or classes of groups of customers; or (vii) the existence of any such prospective contract, agreement, understanding, or relationship, as well as any proprietary customer information.

M.    "Person" means any natural person, corporation, association, firm, partnership, or other business or legal entity.

N.    "Screenvision" means, SV Holdco, LLC, a Delaware limited liability company, headquartered in New York, New York, and the subsidiary it owns and operates, Screenvision Exhibition, Inc., its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

### III. APPLICABILITY

A.    This Final Judgment applies to AMC and Carmike, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

B.    If, prior to complying with Sections IV, VI, VII or XI of this Final Judgment, Defendants sell or otherwise dispose of all or substantially all of their assets or of lesser business units that include the Theatre Divestiture Assets or NCM Divestiture Assets, they shall require the purchaser to be bound by the provisions of this Final Judgment. Defendants need not obtain such an agreement from the Acquirer(s) of the assets divested pursuant to this Final Judgment.

### IV. DIVESTITURES OF THEATRES

A.    Defendants are ordered and directed, within sixty (60) calendar days after the filing of the Complaint in this matter, or five (5) calendar days after notice of entry of this Final

Judgment by the Court, whichever is later, to divest the Initial Theatre Divestiture Assets in a manner consistent with this Final Judgment to one or more Acquirer(s) acceptable to the United States in its sole discretion.  The United States, in its sole discretion, may agree to one or more extensions of this time period, not to exceed sixty (60) calendar days in total, and shall notify the Court in such circumstances. Defendants agree to use their best efforts to divest the Initial Theatre Divestiture Assets as expeditiously as possible.

      B.      If Defendants fail to accomplish the screen transfer required by Section XI(A) below for any Screen Transfer Theatre, Defendants are ordered and directed, within sixty (60) calendar days after the expiration of the transfer period provided for in Section XI(A), and any extensions to that period granted by the United States, to divest the Screen Transfer Divestiture Assets in a manner consistent with this Final Judgment to one or more Acquirer(s) acceptable to the United States in its sole discretion.  The United States, in its sole discretion, may agree to one or more extensions of this time period, not to exceed ninety (90) calendar days in total, and shall notify the Court in such circumstances. Defendants agree to use their best efforts to divest the Screen Transfer Divestiture Assets as expeditiously as possible.  Defendants shall not divest the Screen Transfer Divestiture Assets to any Acquirer that contracts with NCM to provide pre-show and cinema advertising services.  Such Screen Transfer Theatres must be divested free and clear of any contracts with NCM to provide pre-show and cinema advertising services.

      C.      In accomplishing the divestitures ordered by this Final Judgment, Defendants promptly shall make known, by usual and customary means, the availability of the Theatre Divestiture Assets.  Defendants shall inform any person making an inquiry regarding a possible purchase of the Theatre Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment.  Defendants shall offer to

furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Theatre Divestiture Assets customarily provided in a due diligence process except such information or documents subject to the attorney-client privilege or work-product doctrine. Defendants shall make available such information to the United States at the same time that such information is made available to any other person.

D.      Defendants shall provide the Acquirer(s) and the United States information relating to the personnel involved in the operation and management of the applicable Theatre Divestiture Assets to enable the Acquirer(s) to make offers of employment. Defendants shall not interfere with any negotiations by the Acquirer(s) to employ or contract with any employee of any Defendant whose primary responsibility relates to the operation or management of the applicable Theatre Divestiture Assets being sold to the Acquirer(s).

E.      Defendants shall permit prospective Acquirer(s) of the Theatre Divestiture Assets to have reasonable access to personnel and to make inspections of the physical facilities of the Theatre Divestiture Assets; access to any and all environmental, zoning, and other permit documents and information; and access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

F.      In connection with the divestiture of the Theatre Divestiture Assets, at the option of the Acquirer(s), Defendants shall enter into a transitional supply, service, support, and use agreement ("transitional agreement"), of up to 120 days in length, for the supply of any goods, services, support, including software service and support, and reasonable use of the names AMC and Carmike, and any registered service marks of AMC or Carmike, that the Acquirer(s) request for the operation of the Theatre Divestiture Assets, during the period covered by the transitional agreement. At the request of the Acquirer(s), the United States in its sole discretion may agree to

9

one or more extensions of this time period not to exceed six (6) months in total. The terms and conditions of the transitional agreement must be acceptable to the United States in its sole discretion. The transitional agreement shall be deemed incorporated into this Final Judgment and a failure by Defendants to comply with any of the terms or conditions of the transitional agreement shall constitute a failure to comply with this Final Judgment.

G.      Defendants shall warrant to the Acquirer(s) of the Theatre Divestiture Assets that each asset will be operational on the date of sale.

H.      Defendants shall not take any action that will impede in any way the permitting, operation, or divestiture of the Theatre Divestiture Assets.

I.      Defendants shall warrant to the Acquirer(s) that there are no material defects in the environmental, zoning, or other permits pertaining to the operation of the Theatre Divestiture Assets. Following the sale of the Theatre Divestiture Assets, Defendants will not undertake, directly or indirectly, any challenges to the environmental, zoning, or other permits relating to the operation of the Theatre Divestiture Assets.

J.      Unless the United States otherwise consents in writing, the divestitures made pursuant to Section IV(A) and IV(B), or by a Divestiture Trustee appointed pursuant to Section VI of this Final Judgment, shall include the entire Theatre Divestiture Assets, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion that the Theatre Divestiture Assets can and will be used by the Acquirer(s) as part of a viable, ongoing business of operating theatres that exhibit primarily first-run, commercial movies. Divestiture of the Theatre Divestiture Assets may be made to one or more Acquirers, provided that in each instance it is demonstrated to the sole satisfaction of the United States that the Theatre Divestiture Assets will remain viable and the divestiture of such assets will remedy the competitive harm alleged in

the Complaint.  The divestitures, whether pursuant to Section IV (A), IV (B), or VI of this Final
Judgment,

    (1)    shall be made to Acquirers that, in the United States' sole judgment have
the intent and capability (including the necessary managerial, operational,
technical, and financial capability) of competing effectively in the business
of theatres exhibiting primarily first-run, commercial movies; and

    (2)    shall be accomplished so as to satisfy the United States, in its sole
discretion, that none of the terms of any agreement between Acquirers and
Defendants gives Defendants the ability unreasonably to raise the
Acquirers' costs, to lower the Acquirers' efficiency, or otherwise to
interfere in the ability of any Acquirer to compete effectively.

    K.    If Defendants are unable to effect any of the divestitures required herein due to
the inability to obtain the Landlord Consent for any of the Theatre Divestiture Assets,
Defendants shall divest alternative theatre assets that compete effectively with the theatre or
theatres for which the Landlord Consent was not obtained.  The United States shall, in its sole
discretion, determine whether such theatre assets compete effectively with the theatres for which
Landlord Consent was not obtained.

    L.    Within five (5) business days following a determination that Landlord Consent
cannot be obtained for any of the Theatre Divestiture Assets, Defendants shall notify the United
States, and Defendants shall propose an alternative divestiture pursuant to Section IV(K).  The
United States shall have then ten (10) business days in which to determine whether such theatre
assets are a suitable alternative pursuant to Section IV(K).  If Defendants' selection is deemed
not to be a suitable alternative, the United States shall in its sole discretion select alternative

theatre assets to be divested from among those theatre(s) that the United States has determined, in its sole discretion, compete effectively with the theatre(s) for which Landlord Consent was not obtained.

      M.     If a Divestiture Trustee is responsible for effecting divestiture of the Theatre Divestiture Assets, it shall notify the United States and Defendants within five (5) business days following a determination that Landlord Consent cannot be obtained for one or more of the Theatre Divestiture Assets.  Defendants shall thereafter have five (5) business days to propose an alternative divestiture pursuant to Section IV(K).  The United States shall then have ten (10) business days to determine whether the proposed theatre assets are a suitable competitive alternative pursuant to Section IV(K).  If Defendants' selection is deemed not to be a suitable competitive alternative, the United States shall in its sole discretion select alternative theatre assets to be divested from among those theatre(s) that the United States has determined, in its sole discretion, compete effectively with the theatre(s) for which Landlord Consent was not obtained.

## V. <u>NOTICE OF PROPOSED THEATRE DIVESTITURES</u>

      A.     Within two (2) business days following execution of a definitive divestiture agreement, Defendants or the Divestiture Trustee, whoever is then responsible for effecting the divestitures required herein, shall notify the United States of any proposed divestitures required by Sections IV(A), IV(B), and VI of this Final Judgment.  If the Divestiture Trustee is responsible, it shall similarly notify Defendants.  The notice shall set forth the details of the proposed divestitures and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Theatre Divestiture Assets, together with full details of the same.

12

B.      Within fifteen (15) calendar days of receipt by the United States of such notice, the United States, in its sole discretion, may request from Defendants, the proposed Acquirer(s), any other third party, or the Divestiture Trustee, if applicable, additional information concerning the proposed divestitures, the proposed Acquirer(s), and any other potential Acquirer(s). Defendants and the Divestiture Trustee shall furnish any additional information requested to the United States within fifteen (15) calendar days of receipt of the request, unless the parties otherwise agree.

C.      Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States has been provided the additional information requested from Defendants, the proposed Acquirer(s), any third party, and the Divestiture Trustee, whichever is later, the United States shall provide written notice to Defendants, and the Divestiture Trustee, if there is one, stating whether it objects to the proposed divestitures.  If the United States provides written notice that it does not object, the divestitures may be consummated, subject only to the Defendants' limited right to object to the sale under Section VI(C) of this Final Judgment.  Absent written notice that the United States does not object to the proposed Acquirer(s) or upon objection by the United States, a divestiture proposed under Section IV(A), IV(B), or VI shall not be consummated.  Upon objection by Defendants under Section VI(C), a divestiture proposed under Section VI shall not be consummated unless approved by the Court.

## VI. APPOINTMENT OF TRUSTEE FOR THEATRE DIVESTITURES

A.      If Defendants have not divested the Theatre Divestiture Assets within the time period specified in Section IV(A) and IV(B), respectively, Defendants shall notify the United States of that fact in writing, specifically identifying the Theatre Divestiture Assets that have not

been divested. Upon application of the United States, the Court shall appoint a Divestiture

Trustee selected by the United States and approved by the Court to effect the divestiture of the

applicable Theatre Divestiture Assets.

   B.  After the appointment of a Divestiture Trustee becomes effective, only the

Divestiture Trustee shall have the right to sell the applicable Theatre Divestiture Assets. The

Divestiture Trustee shall have the power and authority to accomplish the divestitures to

Acquirer(s) acceptable to the United States at such price and on such terms as are then obtainable

upon reasonable effort by the Divestiture Trustee, subject to the provisions of Sections IV, V, VI

VIII, IX, and XIV, of this Final Judgment, and shall have such other powers as this Court deems

appropriate. Subject to Section VI (D) of this Final Judgment, the Divestiture Trustee may hire

at the cost and expense of Defendants any investment bankers, attorneys, or other agents, who

shall be solely accountable to the Divestiture Trustee and reasonably necessary in the Divestiture

Trustee's judgment to assist in the divestiture(s). Any such investment bankers, attorneys, or

other agents shall serve on such terms and conditions as the United States approves, including

confidentiality requirements and conflict of interest certifications.

   C.  Defendants shall not object to a sale by the Divestiture Trustee on any ground

other than the Divestiture Trustee's malfeasance. Any such objections by Defendants must be

conveyed in writing to the United States and the Divestiture Trustee within ten (10) calendar

days after the Divestiture Trustee has provided the notice required under Section V.

   D.  The Divestiture Trustee shall serve at the cost and expense of Defendants

pursuant to a written agreement, on such terms and conditions as the United States approves,

including confidentiality requirements and conflict of interest certifications. The Divestiture

Trustee shall account for all monies derived from the sale of the applicable Theatre Divestiture

Assets, and all costs and expenses so incurred.  After approval by the Court of the Divestiture

Trustee's accounting, including fees for its services yet unpaid and those of any professionals

and agents retained by the Divestiture Trustee, all remaining money shall be paid to Defendants

and the trust shall then be terminated.  The compensation of the Divestiture Trustee and any

professionals and agents retained by the Divestiture Trustee shall be reasonable in light of the

value of the Theatre Divestiture Assets subject to sale by the Divestiture Trustee and based on a

fee arrangement providing the Divestiture Trustee with an incentive based on the price and terms

of the divestitures and the speed with which they are accomplished, but timeliness is paramount.

If the Divestiture Trustee and Defendants are unable to reach agreement on the Divestiture

Trustee's or any agents' or consultants' compensation or other terms and conditions of

engagement within 14 calendar days of appointment of the Divestiture Trustee, the United States

may, in its sole discretion, take appropriate action, including making a recommendation to the

Court.  The Divestiture Trustee shall, within three (3) business days of hiring any other

professionals or agents, provide written notice of such hiring and the rate of compensation to

Defendants and the United States.

   E.  Defendants shall use their best efforts to assist the Divestiture Trustee in

accomplishing the required divestitures.  The Divestiture Trustee and any consultants,

accountants, attorneys, and other persons retained by the Divestiture Trustee shall have full and

complete access to the personnel, books, records, and facilities of the assets and business to be

divested, and Defendants shall develop financial and other information relevant to such assets

and business as the Divestiture Trustee may reasonably request, subject to reasonable protection

for trade secret or other confidential research, development, or commercial information or any

applicable privileges.  Defendants shall take no action to interfere with or to impede the Divestiture Trustee's accomplishment of the divestitures.

   F. After its appointment, the Divestiture Trustee shall file monthly reports with the parties and the Court setting forth the Divestiture Trustee's efforts to accomplish the divestitures ordered under this Final Judgment.  To the extent such reports contain information that the Divestiture Trustee deems confidential, such reports shall not be filed in the public docket of the Court.  Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Theatre Divestiture Assets, and shall describe in detail each contact with any such person. The Divestiture Trustee shall maintain full records of all efforts made to divest the Theatre Divestiture Assets.

   G. If the Divestiture Trustee has not accomplished the divestitures ordered under this Final Judgment within six (6) months after its appointment, the Divestiture Trustee shall promptly file with the Court a report setting forth (1) the Divestiture Trustee's efforts to accomplish the required divestitures, (2) the reasons, in the Divestiture Trustee's judgment, why the required divestitures have not been accomplished, and (3) the Divestiture Trustee's recommendations.  To the extent such reports contain information that the Divestiture Trustee deems confidential, such reports shall not be filed in the public docket of the Court.  The Divestiture Trustee shall at the same time furnish such report to the United States, which shall have the right to make additional recommendations consistent with the purpose of the trust.  The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of

the Final Judgment, which may, if necessary, include extending the trust and the term of the Divestiture Trustee's appointment by a period requested by the United States.

H.      If the United States determines that the Divestiture Trustee has ceased to act or failed to act diligently or in a reasonably cost-effective manner, it may recommend the Court appoint a substitute Divestiture Trustee.

## VII.  DIVESTITURE OF NCM HOLDINGS

A.      Defendants are hereby ordered and directed, in accordance with the terms of this Final Judgment, on or before June 20, 2019, to divest that portion of the NCM Holdings sufficient to cause Defendants to own no more than 4.99 percent of the outstanding shares of NCM on a fully converted basis (the "NCM Divestiture Assets"). Defendants must divest the NCM Divestiture Assets on the following schedule: (i) on or before twelve (12) months from the date of the filing of the Complaint in this matter that portion of the NCM Holdings sufficient to cause Defendants to own no more than 15 percent of all outstanding shares of NCM on a fully converted basis, (ii) on or before twenty-four (24) months from the date of the filing of the Complaint in this matter that portion of the NCM Holdings sufficient to cause Defendants to own no more than 7.5 percent of all outstanding shares of NCM on a fully converted basis; and (iii) on or before June 20, 2019 that portion of the NCM Holdings sufficient to cause Defendants to own no more than 4.99 percent of all outstanding shares of NCM on a fully converted basis. The United States, in its sole discretion, may agree to one or more extensions of this time period, not to exceed sixty (60) calendar days in total, and shall notify the Court in such circumstances.

B.      Defendants are enjoined and restrained from the date of the filing of the Complaint in this matter from acquiring, directly or indirectly, any additional NCM Holdings except to the extent an NCM annual audience attendance adjustment or an acquisition of a movie

17

theatre or movie theatre chain results in Defendants' NCM Holdings exceeding the thresholds set forth in Section VII (A).  To the extent an NCM annual audience attendance adjustment or an acquisition of a movie theatre or movie theatre chain results in Defendants' NCM Holdings' exceeding the thresholds set forth in Section VII (A), then Defendants shall have 90 days from the date their NCM Holdings exceed the applicable threshold in Section VII (A) to sell down their NCM Holdings so that their NCM Holdings comply with the applicable threshold.  The United States, in its sole discretion, may agree to one or more extensions of this time period, not to exceed 60 calendar days in total, and shall notify the Court in such circumstances.

C.      The divestitures required by Section VII(A) may be made by open market sale, public offering, private sale, repurchase by NCM, or a combination thereof.  Such divestitures shall not be made by private sale or placement to any person who provides pre-show and cinema advertising services other than NCM unless the United States, in its sole discretion, shall otherwise agree in writing.

## VIII.  FINANCING

Defendants shall not finance all or any part of any purchase made pursuant to Sections IV or VII of this Final Judgment.

## IX.  HOLD SEPARATE

Until the divestitures of the Theatre Divestiture Assets required by this Final Judgment have been accomplished, Defendants shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court.  Defendants shall take no action that would jeopardize the divestitures ordered by this Court.

## X. **NCM PROHIBITED CONDUCT**

A.      From the date of the filing of the Complaint in this matter, Defendants are enjoined and restrained, directly or indirectly, from holding any governance rights in NCM, including any seats on NCM's Board of Directors and from exercising any voting rights in NCM.

B.      From the date of the filing the Complaint in this matter, Defendants are enjoined and restrained, directly or indirectly, from:

1.  Suggesting, individually or as part of a group, any candidate for election to NCM's Board of Directors, or having any officer, director, manager, employee, or agent serve as an officer, director, manager, employee, or in a comparable position with or for NCM;

2.  Using or attempting to use any ownership interest in NCM to exert any influence over NCM in the conduct of NCM's business, including but not limited to, NCM's strategies regarding the pricing of NCM's services;

3.  Using or attempting to use any rights or duties under any advertising agreement or relationship between Defendants and NCM (including any rights or duties Defendants may have as a customer of NCM), to influence NCM in the conduct of NCM's business with respect to any Person other than AMC;

4.  Participating in, being present at, or receiving any notes, minutes, or agendas of, information from, or any documents distributed in connection with, any nonpublic meeting of NCM's Board of Directors or any committee thereof, or any other governing body of NCM. For purposes of

this provision, the term "meeting" includes any action taken by consent of the relevant directors in lieu of a meeting;

5.   Voting or permitting to be voted any NCM shares that Defendants own unless the United States, in its sole discretion, otherwise consents in writing;

6.   Communicating to or receiving from any officer, director, manager, employee, or agent of NCM any nonpublic information regarding any aspect of Defendants' or NCM's business, including any plans or proposals with respect thereto; and

7.   Proposing to any officer, director, manager, employee, or agent of NCM that NCM merge with, acquire, or sell itself to another Person.

C.      Nothing in this Section, however, is intended to prevent: (i) Defendants from procuring preshow and cinema advertising services from NCM, including receiving necessary non-public information from NCM in the context of the Defendants' customer relationship regarding the same, or to prevent NCM from providing pre-show and cinema advertising services to Defendants, including providing necessary non-public information to Defendants in the context of NCM's vendor relationship regarding the same; (ii) joint promotions between NCM and Defendants and communications regarding the provision or procurement of pre-show and cinema advertising services from NCM or Defendants, respectively; (iii) Defendants from hiring NCM personnel or NCM from hiring Defendants personnel (provided that such personnel are not simultaneously employed or otherwise affiliated with NCM or Defendants, respectively); and (iv) nonpublic communications regarding industry-wide issues or possible potential business

transactions between the two companies provided that such communications do not violate the antitrust laws or any other applicable law or regulation.

## XI. TRANSFER OF NCM-ALIGNED THEATRE SCREENS

A.     Defendants are hereby ordered and directed, within sixty (60) calendar days of the filing of the Complaint in this matter, to (i) implement, use, and continuously display Screenvision pre-show services and cinema advertising at the Screen Transfer Theatres for the term of this Final Judgment; and (ii) discontinue and permanently remove NCM pre-show services and cinema advertising at the Screen Transfer Theatres for the term of this Final Judgment.  The United States, in its sole discretion, may agree to one or more extensions of this time period, not to exceed sixty (60) days in total, and shall notify the Court in such circumstances.

B.     If Defendants do not effectuate the implementation of Screenvision pre-show services and cinema advertising at any Screen Transfer Theatre and the termination, if applicable, of any NCM pre-show services and cinema advertising at that Screen Transfer Theatre during the time period set forth in Section XI(A) (including any extensions to that time period granted pursuant to that Section), then Defendants are ordered and directed to divest that Screen Transfer Theatre pursuant to the terms of Section IV(B) of this Final Judgment.  For the avoidance of doubt, the Screen Transfer Theatres that Defendants must divest pursuant to this paragraph are referred to herein as the "Screen Transfer Divestiture Assets."

## XII. FIREWALLS

A.     Defendants shall implement and maintain reasonable procedures to prevent (i) the sharing of Competitively Sensitive Information between Defendants and NCM except as necessary to administer an exhibitor services agreement or exhibition agreement between NCM

21

and Defendants to supply preshow and cinema advertising services; (ii) the sharing of

Competitively Sensitive Information between Defendants and Screenvision except as necessary

to administer an exhibitor services agreement or exhibition agreement between Screenvision and

Defendants to supply preshow and cinema advertising services; (iii) the sharing of Competitively

Sensitive Information or otherwise serving as a conduit to share Competitively Sensitive

Information between NCM and Screenvision; and (iv) Defendants from obtaining through their

ownership or governance position at Screenvision or NCM any Competitively Sensitive

Information of or about the business of any movie theatre exhibitor other than Defendants.

  B. Defendants shall, within thirty (30) calendar days of the Court's entry of the Hold

Separate Stipulation and Order, submit to the United States a document setting forth in detail the

procedures implemented to effect compliance with this Section. The United States shall notify

Defendants within ten (10) business days whether it approves of or rejects Defendants'

compliance plan, in its sole discretion.

  C. In the event Defendants' compliance plan is rejected, the reasons for the rejection

shall be provided to Defendants and Defendants shall be given the opportunity to submit, within

ten (10) business days of receiving the notice of rejection, a revised compliance plan.  If the

parties cannot agree on a compliance plan, the United States shall have the right to request that

the Court rule on whether Defendants' proposed compliance plan is reasonable.

  D. Defendants may at any time submit to the United States evidence relating to the

actual operation of any firewall in support of a request to modify any firewall set forth in this

Section.  In determining whether it would be appropriate for the United States to consent to

modify the firewall, the United States, in its sole discretion, shall consider the need to protect

NCM, Screenvision, or movie theatre exhibitor Competitively Sensitive Information and the

impact the firewall has had on Defendants' ability to efficiently support the theatrical exhibition of movies.

## XIII. COMPLIANCE PROGRAM

A.      Defendants shall maintain a compliance program that shall include designating, within thirty (30) days of the entry of this Final Judgment, a Compliance Officer with responsibility for achieving compliance with this Final Judgment. The Compliance Officer shall, on a continuing basis, supervise the review of current and proposed activities to ensure compliance with this Final Judgment. The Compliance Officer shall be responsible for accomplishing the following activities:

(1) Distributing, within thirty (30) days of the entry of this Final Judgment, a copy of this Final Judgment to all of Defendants' officers, directors, or any company employee or manager with management responsibility or oversight of theatrical exhibition and preshowcinema advertising services;

(2) Distributing, within thirty (30) days of succession, a copy of this Final Judgment to any Person who succeeds to a position described in Section XIII(A)(1); and

(3) Obtaining within sixty (60) days from the entry of this Final Judgment, and once within each calendar year after the year in which this Final Judgment is entered, and retaining for the term of this Final Judgment, a written certification from each Person designated in Sections XIII(A)(1) and XIII(A)(2) that he or she: (a) ) has received, read, understands, and agrees to abide by the terms of this Final Judgment; (b) understands that failure to comply with this Final Judgment may result in conviction for criminal contempt of court; and (c) is not aware of any

23

violation of the Final Judgment. Copies of such written certifications are to be

promptly provided to the U.S. Department of Justice, Antitrust Division.

B.      Within sixty (60) days of the entry of this Final Judgment, Defendants shall

certify to the United States that they have (1) designated a Compliance Officer, specifying his or

her name, business address and telephone number; and (2) distributed the Final Judgment in

accordance with Section XIII(A)(1).

C.      If any of Defendants' directors or officers or the Compliance Officer learns of any

violation of this Final Judgment, Defendants shall within ten (10) business days provide to the

U.S. Department of Justice, Antitrust Division a written detailed description of the nature of the

violation with the names, titles, and company affiliation of each person involved.

## XIV.  AFFIDAVITS

A.      Within twenty (20) calendar days of the filing of the Complaint in this matter, and

every thirty (30) calendar days thereafter until the divestitures and screen transfers have been

completed under Sections IV(A), IV(B), VI, VII, and XI, Defendants shall deliver to the United

States an affidavit as to the fact and manner of its compliance with Sections IV (A), IV (B), VI,

VII, and XI of this Final Judgment. Each such affidavit pertaining to Sections IV (A), IV (B),

and VI shall include the name, address, and telephone number of each person who, during the

preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring,

entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any

interest in the Theatre Divestiture Assets, and shall describe in detail each contact with any such

person during that period. Each such affidavit pertaining to Sections IV(A), IV(B), and VI shall

also include a description of the efforts Defendants have taken to solicit buyers for and complete

the sale of the Theatre Divestiture Assets, and to provide required information to prospective

Acquirers, including the limitations, if any, on such information. Each such affidavit shall also describe the fact and manner of Defendants' compliance with Section XI (A) and the arrangements Defendants have made to complete the required screen transfers in a timely fashion. Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by Defendants, including limitations on information, shall be made within fourteen (14) calendar days of receipt of each such affidavit.

B.      Within twenty (20) calendar days of the filing of the Complaint in this matter, Defendants shall deliver to the United States an affidavit that describes in reasonable detail all actions taken and all steps implemented on an ongoing basis to comply with Section IX of this Final Judgment. Defendants shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in their earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C.      Defendants shall notify the United States no less than sixty (60) calendar days prior to the expiration of each of the deadlines for divesting the NCM Divestiture Assets identified in Section VII (A) of the arrangements Defendants have made to complete such divestitures in a timely fashion. Defendants shall no later than five (5) calendar days after each of the deadlines identified in Section VII(A) deliver to the United States an affidavit as to the fact and manner of its compliance with Section VII(A).

D.      For the term of this Final Judgment, on or before each annual anniversary of the date of the filing of the Complaint in this matter, Defendants shall file with the United States a statement as to the fact and manner of its compliance with the provisions of Sections VII (B), X, and XII, including a statement of the percentage of all outstanding shares of NCM owned by Defendants and a description of any violations of Sections VII (B), X, and XII.

E.     Defendants shall keep all records of all efforts made to preserve and divest the Theatre Divestiture Assets and the NCM Divestiture Assets until one year after such divestitures have been completed.

## XV. COMPLIANCE INSPECTION

A.     For the purposes of determining or securing compliance with this Final Judgment or of any related orders such as the Hold Separate Stipulation and Order, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to Defendants, be permitted:

(1)     access during Defendants' office hours to inspect and copy, or at the option of the United States, to require Defendants to provide hard copy or electronic copies of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Defendants, relating to any matters contained in this Final Judgment; and

(2)     to interview, either informally or on the record, Defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters.  The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendants.

B.     Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, Defendants shall submit written reports or responses to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C.     No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the

executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.      If at the time information or documents are furnished by Defendants to the United States, Defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then the United States shall give Defendants ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XVI. NO REACQUISITION

Defendants may not reacquire any part of the Theatre Divestiture Assets or the NCM Divestiture Assets during the term of this Final Judgment.

## XVII. RETENTION OF JURISDICTION

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XVIII. EXPIRATION OF FINAL JUDGMENT

Unless this Court grants an extension, this Final Judgment shall expire ten (10) years from the date of its entry.

## XIX. **PUBLIC INTEREST DETERMINATION**

Entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States' responses to comments. Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

Date: March 7, 2017

> Court approval subject to procedures
> of Antitrust Procedures and Penalties
> Act, 15 U.S.C. § 16
>
> _____
> United States District Judge

28

**Appendix A**

|   | Theatre(s) | Address |
|---|---|---|
| 1 | AMC Festival Plaza 16<br><br>**OR**<br><br>Carmike Chantilly 13 Big D | 7925 Vaughn Rd., Montgomery, AL 36116<br><br><br>10477 Chantilly Pkwy, Montgomery, AL 36117 |
| 2 | AMC Destin Commons 14<br><br>**OR**<br><br>Carmike Boulevard 10 Big D | Destin Commons, 4000 Legendary Dr., Destin, FL 32541<br><br>465 Grand Blvd., Miramar Beach, FL 32550 |
| 3 | AMC Orange Park 24<br><br>**OR**<br><br>Carmike Fleming Island 12 | Orange Park Mall, 1910 Wells Rd., Orange Park, FL 32073<br><br>1820 Town Center Blvd., Fleming Island, FL 32003 |
| 4 | AMC Avenue Forsyth 12<br><br>**OR**<br><br>Carmike Movies 400 12 | The Collection at Forsyth, 350 Peachtree Pkwy, Cumming, GA 30041<br><br>415 Atlanta Rd., Cumming, GA 30040 |
| 5 | AMC Stonecrest Mall 16<br><br>**OR**<br><br>Carmike Conyers Crossroads 16 | Ashley Stewart, 8060 Mall Pkwy, Lithonia, GA 30038<br><br>1536 Dogwood Dr. SE, Conyers, GA 30013 |
| 6 | AMC Crestwood 18<br><br>**OR**<br><br>Carmike Digiplex Lansing 8 | 13221 Rivercrest Dr., Crestwood, IL 60445<br><br>16621 Torrence Ave., Lansing, IL 60438 |

| | | |
|---|---|---|
| 7 | AMC Normal 14 **OR** Carmike Ovation Cinema 10 | 201 McKnight St., Normal, IL 61761 415 Detroit Dr., Bloomington, IL 61704 |
| 8 | (AMC Pekin 14) **OR** (Carmike Sunnyland 10 and Carmike Grand Prairie 18) | 1124 Edgewater Dr., Pekin, IL 61554 Washington Plaza, 40 Sunnyland Plaza, Washington, IL 61571 5311 West American Prairie Dr., Peoria, IL 61615 |
| 9 | AMC Inver Grove **OR** Carmike Oakdale 20 | 5567 Bishop Ave., Inver Grove Heights, MN 55076 1188 Helmo Ave. N, Oakdale, MN 55128 |
| 10 | (AMC Coon Rapids and AMC Arbor Lakes 16 **OR** (Carmike Wynnsong 15) | 10051 Woodcrest Dr. NW, Coon Rapids, MN 55433 12575 Elm Creek Blvd. N, Maple Grove, MN 55311 2430 County Hwy 10, Mounds View, MN 55112 |
| 11 | AMC Rockaway 16 **OR** Carmike Digiplex Sparta 3 | 363 Mt Hope Ave., Rockaway, NJ 07866 25 Centre St., Sparta Township, NJ 07871 |
| 12 | (AMC Mountainside 10) **OR** | 1021 Route 22, Mountainside, NJ 07092 |

| | (Carmike Digiplex Rialto Westfield 6 | 250 East Broad St., Westfield, NJ 07090 |
|---|---|---|
| | and | |
| | Carmike Digiplex Cranford 5) | 25 North Ave. W, Cranford NJ 07016 |
| 13 | AMC Lawton 12 | 200 SW C Ave., Lawton, OK 73501 |
| | **OR** | |
| | Carmike Patriot 13 | 2803 NW 67th St., Lawton, OK 73505 |
| 14 | (AMC Tilghman Square 8) | Tilghman Square, 4608 Broadway, Allentown, PA 18104 |
| | **OR** | |
| | (Carmike Promenade 16 + IMAX | 2805 Center Valley Pkwy, Center Valley, PA 18034 |
| | and | |
| | Carmike 16) | 1700 Catasauqua Rd., Allentown, PA 18109 |
| 15 | AMC Fitchburg 18 | 6091 McKee Rd., Fitchburg, WI 53719 |
| | **OR** | |
| | Sundance Carmike Madison | 430 North Midvale Blvd., Madison, WI 53705 |

**Appendix B**

|  | Theatres | Address |
|---|---|---|
| 1 | AMC Barrett Commons 24 | 2600 Cobb Pl. Ln. NW, Kennesaw, GA 30144 |
| 2 | AMC Colonial 18 | Lawrenceville Market Shopping Center, 825 Lawrenceville-Suwanee Rd., Lawrenceville, GA 30043 |
| 3 | AMC Crossroads Mall 16 | 1211 E Interstate 240 Service Rd., Oklahoma City, OK 73149 |
| 4 | AMC Dublin Village 18 | Dublin Village Center, 6700 Village Pkwy, Dublin, OH 43017 |
| 5 | AMC Dutch Square 14 | Dutch Square Mall, 421 Bush River Rd. #80, Columbia, SC 29210 |
| 6 | AMC Showplace Naperville 16 | 2815 Show Place Dr., Naperville, IL 60564 |
| 7 | AMC Newport On the Levee 20 | Newport on the Levee, Levy, 1 Levee Way #4100, Newport, KY 41071 |
| 8 | AMC Starplex Rio Grande 10 | 4586 E US Hwy 83, Rio Grande City, TX 78582 |
| 9 | AMC Southpoint 17 | The Streets at Southpoint, 8030 Renaissance Pkwy, Durham, NC 27713 |
| 10 | AMC Loews Waterfront 22 | 300 W Waterfront Dr., West Homestead, PA 15120 |
| 11 | Sundance Kabuki | 1881 Post St., San Francisco, CA 94115 |

| 12 | Sundance Cinemas Houston | Bayou Place, 510 Texas Ave., Houston, TX 77002 |
|----|--------------------------|-----------------------------------------------|
| 13 | Sundance Cinemas Seattle | 4500 9th Ave. NE, Seattle, WA 98105 |
| 14 | Sundance Sunset Cinema | 8000 Sunset, 8000 Sunset Blvd., Los Angeles, CA 90046 |
| 15 | Sundance Carmike Madison* | 430 North Midvale Blvd., Madison, WI 53705 |
| 16 | AMC Dine-in Theatres Buckhead 6 | Georgia Atlanta Tower Place, Tower Place, 3340 Peachtree Rd NE, Atlanta, GA 30326 |
| 17 | AMC Easton Town Center 30 with Dine-in Theatres & IMAX | Easton Town Center, 275 Easton Station, Columbus, OH 43219 |
| 18 | AMC Dine-in Theatres Esplanade 14 | 2515 E Camelback Rd., Phoenix, AZ 85016 |
| 19 | AMC Grapevine Mills 30 with Dine-in Theatres | Grapevine Mills, 3150 Grapevine Mills Pkwy, Grapevine, TX 76051 |
| 20 | AMC Mesquite 30 with Dine-in Theatres | 19919 Lyndon B Johnson Fwy, Mesquite, TX 75149 |
| 21 | AMC Dine-in Theatres Southlands 16 Featuring Red Kitchen | 23955 E Plaza Ave., Aurora, CO 80016 |
| 22 | AMC Dine-in Theatres West Olive 16 | 12657 Olive Blvd., Creve Couer, MO 63141 |
| 23 | AMC Lawton 12* | 200 SW C Ave., Lawton, OK 73501 |
| 24 | AMC Dine-in Theatres Yorktown 18 | Yorktown Center, 80 Yorktown Shopping Center, Lombard, IL 60148 |

* Transferred to the Screenvision network only to the extent AMC retains these theatres.